Edgar W. BLANCH, et al., Appellants,

v.

The SUBURBAN HENNEPIN REGIONAL PARK DISTRICT, et al., Respondents.

No. C2–89–643.

Supreme Court of Minnesota.

Dec. 15, 1989.

Eric J. Magnuson, William J. Egan, Rider, Bennett, Egan & Arundel, Minneapolis, for appellants.

Jeffrey A. Brauchle, Lucinda E. Jesson, Oppenheimer, Wolff & Donnelly, Minneapolis, for Suburban Hennepin Regional Park Dist., et al.

Peter Ackerberg, Asst. Atty. Gen., St. Paul, for State of Minn.

Jay M. Heffern, Lynn M. Belgea, St. Paul, for Metropolitan Council.

COYNE, Justice.

The City of Minnetrista and five individual owners of land within that city challenge a 1988 law authorizing The Suburban Hennepin Regional Park District to acquire property for a regional park on Lake Minnetonka without local consent or approval by any affected municipality or other local governmental unit. The challenge to the validity of Act of April 28, 1988, ch. 686, art. 1, § 26, 1988 Minn.Laws 2805–06, (hereinafter called "the park bill") is two-pronged: (1) that the park bill, to which the City of Minnetrista objects, is a special law subject to the consent requirements of Minn. Const. art. 12, § 2; and (2) that the park bill contains more than one subject in violation of Minn. Const. art. 4, § 17. On appeal from summary judgment in favor of the defendants, this court accepted accelerated review. We affirm.

The park bill is one of the more recent developments in the saga of executive and legislative concern with public access to Lake Minnetonka. In 1979 the Metropolitan Water Access Task Force—formed in 1978 at the behest of the Legislative Commission on Minnesota Resources and composed of representatives from the Department of Natural Resources ("DNR"), the Metropolitan Council, and the agency now known as the Minnesota Department of Energy and Economic Development—issued its report identifying Lake Minnetonka as a priority site among lakes in the metropolitan area for the acquisition of land for public access.

In 1981 the DNR, which had for more than 10 years sought an access site on Lake Minnetonka, identified a suitable parcel of land within the City of Minnetrista. Although the landowner then indicated a willingness to sell, Minnetrista opposed the acquisition, and Governor Quie intervened. Instructing the DNR to discontinue its effort to acquire the land, the governor established the Lake Minnetonka Task Force to study the issue and to make recommendations to the governor and the legislature.

In the spring of 1983 the governor's task force reported its findings of both need and demand for additional access and parking facilities on the south and west shores of Lake Minnetonka and recommended that land for additional access be sought in an area which includes the City of Minnetrista. The report was endorsed by the DNR and the Lake Minnetonka Conservation District as well as other governmental agencies. At about the same time, a revised edition of the Metropolitan Council's Metropolitan Water Access Task Force report, entitled "A Cooperative Program for Providing Public Access Sites on Metropolitan Area Lakes", rated 95 metropolitan area lakes according to three characteristics—size/shape, type of fish, and water clarity. Lake Minnetonka was one of the six lakes

given a high rating on all three characteristics, and it was also identified as having inadequate public access.

The DNR then renewed its efforts to obtain an access site, and in 1985 the City of Minnetrista requested Governor Perpich to intervene. The State Executive Council asked the Metropolitan Council to undertake a comprehensive review of the issues involved in public access to Lake Minnetonka. In April of 1986, the Metropolitan Council's new task force on Lake Minnetonka issued its detailed report stating that little had been done to implement the recommendations of the 1983 governor's task force and that there was still a shortage of public access to Lake Minnetonka. The principal recommendation of the council's 1985 task force was that The Suburban Hennepin Regional Park District be directed to prepare a master plan and to acquire, develop and operate a regional park on Lake Minnetonka. The Metropolitan Council adopted the recommendation, and a year later, after holding eight public meetings, the Regional Park District issued its "Feasibility Report for a Regional Park on Lake Minnetonka and Acquisition Master Plan". The feasibility report specifically identified 292 acres fronting on Smithtown and Halsted's Bays as a potential acquisition site. The report described the land, all of which lay within the City of Minnetrista, as "the last remaining large tracts of open land on Lake Minnetonka that have the potential to meet the standards for a regional park." The feasibility report stated that the landowners had indicated a willingness to discuss a sale to the park district and that "the major issue confronting the establishment of a regional park on Lake Minnetonka is the position of the City of Minnetrista."

As soon as the park district announced its intention to pursue acquisition of the 292 acres identified in its report, Minnetrista proposed the development of a 50–acre park within the city. When this proposal was rejected, the city proposed the development of a 125–acre site within its borders on Smithtown Bay. When the park district failed to evince any interest in its second proposal, the city proposed a 306–acre park which would include island holdings in addition to the 125 acres on Smithtown Bay. At no time has the park district manifested any interest in altering its master plan.

The Metropolitan Council had approved the park district's master plan on April 11, 1987, and the legislature promptly appropriated $6 million for the "acquisition and betterment of land on Lake Minnetonka for a regional park." At the request of the park district and the Metropolitan Council, the legislature enacted the 1988 park bill, Act of April 28, 1988, ch. 686, art. 1, § 26, 1988 Minn.Laws 1199–1200. By resolution 69–88, adopted on June 20, 1988, the City of Minnetrista formally disapproved the park bill. The City of Minnetrista and five individual owners of land lying within the boundaries of the regional park described in the park district's master plan brought this action against the park district, the Minnesota Attorney General, and the State of Minnesota. The Metropolitan Council intervened.[1]

■ Minnetrista contends that the park bill, set out below in its entirety, is a constitutionally unsound special law:

Sec. 26. [REGIONAL PARK ACQUISITION.]

Subd. 1. [LEGISLATIVE FINDINGS.] The legislature finds that there is a need for a regional park on Lake Minnetonka to serve the recreation open space needs of the citizens of the entire metropolitan area and that it is in the public interest to authorize acquisition of land for such a park in accordance with the master plan approved by the metropolitan council.

Subd. 2. [ACQUISITION.] Notwithstanding any contrary provision of law, the suburban Hennepin regional park district may acquire real property for a Lake Minnetonka regional park by purchase, gift, or eminent domain pursuant

---

1. For clarity and ease of reference, the plaintiffs will be called, collectively, "Minnetrista" and the defendants, "the park district."

to Minnesota Statutes, chapter 117, without local consent or approval by any affected municipality or other local governmental unit.

Subd. 3. [METROPOLITAN COUNCIL APPROVAL.] Before any acquisition of real property by eminent domain pursuant to subdivision 1, the metropolitan council must find, following public hearing, that:

(1) acquisition of the property is in the public interest;

(2) negotiations for acquisition of the property have not resulted in acquisition of land by purchase;

(3) the proposed acquisition is consistent with the approved master plan maintained by the metropolitan council; and

(4) the district is able to carry out the plan and operate the regional park.

The findings required by this subdivision may have been made before or may be made on or after the effective date of this act.

Subd. 4. [SMALL HOMESTEAD LIFE ESTATE.] The park district may not acquire the fee title to a homestead of less than 20 acres by eminent domain without the written consent of the owner, but the district may acquire all title to the property except for a life estate in the person or persons residing on the homestead.

Subd. 5. [EXPIRATION.] Authority to acquire real property through eminent domain as provided in subdivisions 2 and 3 expires on December 31, 1989, except that an acquisition approved by the metropolitan council before January 1, 1990, may continue.

Subd. 6. [APPLICATION.] This section applies in the counties of Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, and Washington.

Act of April 28, 1988, ch. 686, art. 1, § 26, 1988 Minn.Laws 1199–1200.

As a general rule the Minnesota Constitution prohibits special legislation.[2] When a general law can be made applicable, a special law can be enacted only if it meets the requirements of article 12, section 2:

Every law which upon its effective date applies to a single local government unit or to a group of such units in a single county or a number of contiguous counties is a special law and shall name the unit or, in the latter case, the counties to which it applies. The legislature may enact special laws relating to local government units, but a special law, unless otherwise provided by general law, shall become effective only after its approval by the affected unit expressed through the voters or the governing body and by such majority as the legislature may direct.

Although the park district contends that the park bill meets the requirements of the three-part test adopted in *In re Tveten,* 402 N.W.2d 551, 558–59 (Minn.1987), and is, therefore, a general law which is not subject to the requirements of article 12, section 2, passing the rational basis test does not convert this special law into a general law. The park bill specifically designates the Metropolitan Council and The Suburban Hennepin Regional Park District as the agencies authorized and directed to acquire land and develop a regional park on Lake Minnetonka in accordance with a master plan approved by the Metropolitan Council and must, we believe, be characterized as a special law.

 Minnetrista contends that the park bill violates article 12, section 2 because it is a special law which expressly provides that it shall be effective without the approval of the voters or governing body of the City of Minnetrista. The contention is based on a misreading of subdivision 2 of the park bill which authorizes the park district to acquire real property for a Lake Minnetonka regional park without local consent or approval by any affected munici-

**2.** Article 12, section 1 of the Minnesota Constitution reads in relevant part:

    In all cases when a general law can be made applicable, a special law shall not be enacted except as provided in section 2. Whether a general law could have been made applicable in any case shall be judicially determined without regard to any legislative assertion on that subject.

pality or other governmental unit in derogation of the limitation on the power of park districts contained in Minn.Stat. § 398.09(b) (1988).

It must be conceded, of course, that nothing in the park bill defers the effective date until approval by the affected unit. Minnetrista chooses to characterize itself as the only affected unit, but it is apparent that the park bill, which charges the Metropolitan Council and the park district by name with the establishment of a regional park on Lake Minnetonka, also affects both the Metropolitan Council and the park district. Minnetrista, on the other hand, is not identified by name in the park bill, and it will be affected by the legislation only when and if the Metropolitan Council and the park district carry out the legislative directive by following their master plan in its present form. Surely, article 12, section 2 does not empower Minnetrista, whose comprehensive plans are subject to modification by the Metropolitan Council [Minn. Stat. § 473.175, subd. 1 (1988)], to veto the park bill to which both the Metropolitan Council, which is charged with the duty of ultimate approval of the comprehensive plans of all local governmental units in the seven-county metropolitan area as well as the Lake Minnetonka regional park, and the park district, which must carry out the master plan for the regional park, have consented.

■ Furthermore, Minn.Stat. § 645.023, subd. 1, obviates the necessity of local consent if the special law is in any one of three classes, two of which are relevant here. Subdivision 1(a) provides that "[a] law which enables one or more local government units to exercise authority not granted by general law" becomes effective without the approval of any affected local government unit or group of such units. Minn.Stat. § 398.09 authorizes park districts to acquire lands by gift or devise, by purchase or by condemnation, but withholds authorization to acquire by purchase or condemnation real estate which is located within the boundaries of an incorporated statutory city or city unless the city's governing body consents by resolution duly adopted. Hence, the park bill, by authorizing acquisition of land for a Lake Minnetonka regional park without local consent enables the park district to exercise authority not granted by general law. There was, therefore, no requirement that affected local government units approve the park bill before it became effective. *Davies v. City of Minneapolis*, 316 N.W.2d 498, 501 (Minn.1982).

The park bill is also exempted from local consent by section 645.023, subd. 1(c), which sets out an exception for "[a] law which applies to a single unit or a group of units with a population of more than 1,000,000 people." First, the population of the territory within the park district is greater than 1 million.[3] Second, a regional park on Lake Minnetonka has always been intended to serve the entire metropolitan area, and the park bill is expressly made applicable to the entire seven-county metropolitan area, the population of which is far greater than 1 million. *See J.L. Shiely Co. v. County of Stearns*, 395 N.W.2d 357, 361 (Minn.1986) (population of 26 contiguous counties to which special law applied was in excess of 1 million; therefore, local consent not required).

■ Minnetrista also complains that the park bill violates the single subject mandate of article 4, section 17 of the Minnesota Constitution: "No law shall embrace more than one subject, which shall be expressed in its title." Minnesota has adopted a test of germaneness in determining whether a law violates the single subject mandate of article 4, section 17:

> All that is necessary is that the act should embrace some one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject.

---

3. In 1980, the population of Hennepin County was 941,411, of Carver County 37,046, and Scott County 43,784. *Minnesota Legislative Manual* 242, 234, 264 (1987–1988).

*Wass v. Anderson,* 312 Minn. 394, 402, 252 N.W.2d 131, 137 (1977) (quoting *Johnson v. Harrison,* 47 Minn. 575, 577, 50 N.W. 923, 924 (1891)).

The park bill is found in Minn.Laws 1988, ch. 686, a bill of many parts directed to the organization and operation of state government. Chapter 686 contains provisions going to the use of a single appropriation as well as comprehensive appropriations for the general administration and judicial expenses of the state government. *See* Rule 2.02, Joint Rules of the Senate and House of Representatives, *Official Directory of the Minnesota Legislature* 270–71 (1987–1988). The common thread which runs through the various sections of chapter 686 is indeed a mere filament. Were we not of the opinion that the park bill, designed to make possible the utilization of funds appropriated in the preceding session of the legislature, is germane to the broad subject of appropriations for the operation of state government, we would, despite our long-standing tradition of deference to the legislature, be compelled to declare it violative of art. 4, § 17, and, hence, unconstitutional and void.

Since we have determined that the park bill is not constitutionally infirm, we need not here decide whether the presence of more than one subject invalidates an entire bill. Accordingly, we do not address the parties' suggestion that if a bill contains more than one subject, only that provision under attack should be declared unconstitutional; nevertheless, we are constrained to observe that since it is the presence of more than one subject which renders a bill constitutionally infirm, it appears to us at this time unlikely that any portion of such a bill could survive constitutional scrutiny.

Affirmed.

POPOVICH, C.J., and YETKA, SIMONETT and KELLEY, JJ., specially concur.

YETKA, Justice (concurring specially).

I concur in the result. While my views on the subject are fully set out in my concurrence in *Mattson v. Kiedrowski,* 391 N.W.2d 777, 783 (Minn.1986), I do agree that this court may give deference to the legislature by making its rulings prospective only. It was not my intent in *Mattson* nor is it my intent now to declare any act of the legislature unconstitutional if the legislature has not been given proper warning of the consequences of its actions. *See Naftalin v. King,* 257 Minn. 498, 525, 102 N.W.2d 301, 304 (Minn.1960) (a funding measure, though contrary to the constitution, would not be invalidated, but would be if repeated).

Since it now appears that the majority opinion adopts the position of my concurrence in *Mattson* (in which Justice Simonett joined), I am content to affirm this case. The legislature hereafter has full notice of the consequences of overstepping constitutional limitations in its drafting of omnibus bills.

KELLEY, Justice.

I join the concurrence of Justice Yetka.

SIMONETT, Justice.

I join the concurrence of Justice Yetka.

POPOVICH, Chief Justice (concurring specially).

I agree that the park provision (Act of April 28, 1988, ch. 686, art. 1, § 26, 1988 Minn.Laws 1199–1200) is not a special law and does not impermissibly contain more than one subject as prohibited by Minn. Const. art. 4, § 17, which provides: "Sec. 17. **Laws to embrace only one subject.** No law shall embrace more than one subject, which shall be expressed in its title."

Chapter 686, an omnibus appropriations bill, was crafted and passed pursuant to Rule 2.02, Joint Rules of the Senate and House of Representatives, *Official Directory of the Minnesota Legislature* 270–71 (1987–1988), which provides in part:

> [T]he Committee on Finance of the Senate and the Committee on Appropriations of the House shall report to their respective houses, unless directed by concurrent resolution to report different appropriation bills, eight separate appropriation bills as follows:

(a) A bill appropriating money for the general administrative and judicial expenses of the State government for the succeeding two fiscal years including salaries, office expenses and supplies and other necessary expenses connected therewith;

(b) A bill covering all appropriations relating to public welfare, health and corrections for the support and maintenance of all State penal and charitable institutions, and other institutions of the State except educational for the two succeeding fiscal years;

(c) A bill appropriating money for the support and maintenance of all State educational institutions for the two succeeding fiscal years;

(d) A bill covering all appropriations providing for the payment of claims against the State of Minnesota which may have been allowed by the Finance Committee of the Senate or the Appropriations Committee of the House;

(e) A bill covering all appropriations made for semi-state activities;

(f) A bill covering all appropriations for construction and major rehabilitation of public buildings to be financed by issuance of bonds;

(g) A bill covering all appropriations for maintenance, repair, and minor rehabilitation and construction of public buildings; and

(h) A bill covering appropriations for the department of transportation. No other appropriations shall be contained in any of said bills but all other appropriations shall be contained in separate bills.

This rule provides for eight major omnibus appropriation bills for the succeeding biennium. These major appropriation measures have been provided by joint rule or practice since statehood, varying in number as the needs of the state have grown in complexity. At one time the rule read "shall report to their respective houses three separate bills" and was changed in 1939 to read "six separate bills." In 1971 the rule was changed to read "eight separate appropriation bills," the provision that exists today.

In recent years other omnibus non-appropriation measures on substantive areas of the law have also been enacted. This trend of lumping numerous individually introduced measures into one all-encompassing measure has lessened paperwork and improved legislative procedural efficiency. While salutary in purpose, vices of logrolling and tradeoffs are possible. As recently as 1986, the legislature was alerted to the possible violation of article 4, section 17 by Justices Yetka and Simonett's special concurrence in *State ex rel. Mattson v. Kiedrowski,* 391 N.W.2d 777, 784–85 (Minn. 1986), which involved a provision in an appropriation bill. Since statehood this court has invalidated legislation under this constitutional provision in only two cases: *State v. Women's & Children's Hosp.,* 143 Minn. 137, 138–39, 173 N.W. 402, 402 (1919), and *Winona & St. Peter R.R. v. Waldron,* 11 Minn. 515, —— (Gil. 392, 404) (1866), but neither involved appropriation bills.

It is evident by the opinions of the justices in this matter that the court is increasingly concerned about the possibilities of future violations of article 4, section 17. I have written separately because of the chaos that could result if an omnibus appropriation bill was declared invalid. Appellants argued before the trial court and before us that severability of the challenged provision would suffice. In view of the court's holding and views today, that issue need not be decided now. I do point out that the constitutional provision says "[n]o law shall embrace more than one subject" and a likely possibility exists that if an improper provision is included in a major appropriation law the entire law could fall. This approach clearly would be a greater deterrent to risking a constitutional violation than severing only a challenged provision—because the latter approach would then permit the legislature "to take a chance" since the entire law would not fall.

Here the title of chapter 686 is long and reads in part:

An act relating to the organization and operation of state government; appropri-

ating money for the general legislative, judicial, and administrative expenses of state government; providing for the transfer of certain money in the state treasury; fixing and limiting fees; authorizing suburban Hennepin regional park district to acquire land for Lake Minnetonka regional park without local consent; * * *.

It complies with Rule 2.02 [1] and the thread binding its provisions as a single subject is broadly labeled in the first two clauses. Additionally, the legislative history does not indicate logrolling; it did pass the House in that body's appropriation bill, and was retained in conference deliberations in the final measure adopted by the House and Senate.

The views of the justices expressed today should be considered as instructive, alerting a co-equal branch of government, the legislature, to our concerns. In past cases this court has given a liberal construction and deferred to the legislature's classification of the single subject requirement. *See, e.g., Wass v. Anderson,* 312 Minn. 394, 252 N.W.2d 131, 137 (1977); *Johnson v. Harrison,* 47 Minn. 575, 576–78, 50 N.W. 923, 924 (1891). Anyone challenging the constitutionality of a law has an extraordinary burden of persuasion in order to overcome the general presumption of constitutional validity. *See McGuire v. C & L Restaurant Inc.,* 346 N.W.2d 605, 611 (Minn.1984).

---

**1.** While the legislature "may not by its rules ignore constitutional restraints," *United States v. Ballin,* 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892), failure of the legislature to conform to its procedural rules, such as Rule 2.02, "will not impair the validity of a statute." *Mason's Manual of Legislative Procedure* § 24(1) (1989).